AMERICAN DRUGGISTS' SYNDICATE v. CONTINENTAL SPECIALTY CO. OF BALTIMORE, MD., Inc.

(Circuit Court of Appeals, Second Circuit. January 16, 1918.)

No. 108.

SALES ☞24—CONSTRUCTION—OPTION.

A written contract, as modified by defendant's acceptance, relating to the sale by defendant of an ointment manufactured by plaintiff, *held* merely to give defendant an option for the purchase of the formula for the ointment, and not to constitute a binding agreement for its purchase.

In Error to the District Court of the United States for the Eastern District of New York.

Action by the Continental Specialty Company of Baltimore, Md., Incorporated, against the American Druggists' Syndicate. There was a judgment for plaintiff, and defendant brings error. Reversed, and new trial ordered.

Writ of error from a judgment for $45,056.17. The jurisdiction of the District Court depended upon diverse citizenship. The action was upon a contract alleged to have been entered into on the 1st day of April, 1913, by which the defendant agreed to purchase the plaintiff's formula for a certain product known as "the Continental Ointment," together with the right to use the plaintiff's name in connection therewith, for the sum of $50,000. The complaint further alleged that the contract also required the defendant to carry a stock of the products of the plaintiff at its various depots and to pay the defendant 20 cents a pound for the product; that the contract was to last for a period of two years, within which the defendant should have the right to discontinue the sale, and at the end of that two years was to declare its purpose to purchase the formula in question; that the plaintiff was ready and willing to perform the conditions on its part, but that the defendant neglected to push the sale of the products, to carry the stock as far as possible, and to pay the purchase price of $50,000, to the damage of the plaintiff of $50,000.

Upon the trial it appeared that the plaintiff, a Baltimore corporation, was the manufacturer of a certain ointment under a secret formula, which it made at Dayton, Ohio, and in advertising which it had spent approximately $50,000. In the early part of 1913, one Savage, representing the plaintiff, had an interview with one Goddard, representing the defendant, looking toward an agreement by which the defendant should become the selling agent of the plaintiff, and after which an extensive correspondence ensued between the parties. This correspondence is conceded by both sides to be the basis of the parties' rights, and upon its introduction the court dismissed the jury upon motion of both sides for a verdict, and eventually, after due consideration, directed a verdict for the plaintiff for $45,000, the difference between the purchase price of the formula, and what the plaintiff had been able to procure upon its sale, had with notice to the defendant. The correspondence begins on February 18, 1913, by a letter from the plaintiff to the defendant, making a proposal in many respects like that in the letter of April 1, 1913, upon which the plaintiff relies to establish the contract. The chief variation, for the pur-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

poses of this case, between that letter and the letter of April 1, 1913, is in the following paragraph:

"It will be understood and agreed that at any time during the period of five years you are to have the sole and exclusive right to purchase the good will and business of this company, including its trade-mark and formula for preparing its products, and for which you are to pay the sum of fifty thousand ($50,000.00) dollars in cash within five years from the date of this agreement."

The defendant replied on February 21, 1913, saying that it would undertake no responsibility whatever so far as guaranteeing results were concerned, and on February 28, 1913, the plaintiff again replied, substantially restating the terms of its proposal. To this letter the defendant replied on March 4, 1913, that the arrangement outlined in that letter was satisfactory, and added: "You can either consider this letter a formal acceptance of your proposal as outlined in your communication of February 28, or you can prepare a contract embodying the provisions of that letter and send it on for signature." A delay ensued, owing to the necessity of the plaintiff's procuring the consent of its stockholders, and a notice was issued to the stockholders, calling a special meeting for March 27, to consider a proposal "to give an option" to the defendant for the sale of the corporate assets. After some more correspondence the plaintiff wrote to the defendant on April 1, 1913, a letter of which the following is a copy:

"April 1, 1913.

"Mr. C. H. Goddard, Secretary, American Druggists' Syndicate, Borden and Van Alst Aves., Long Island City, N. Y.—Dear Sir: As requested, we herewith submit for your consideration and acceptance a condensed agreement for the operations between this company and your syndicate.

"It is agreed: That the Continental Specialty Company, as also the American Druggists' Syndicate, shall each contribute, to be sold for their mutual benefit and profit, all stock either of them have on hand of the products of the Continental Specialty Company, including all such that may be in the hands of their distributing depots, or that may be now held on consignment by dealers, also including all printed matter consisting of circulars, posters, cut-outs, electrotypes, etc. That the said products so combined shall be sold by the American Druggists' Syndicate at the regular trade prices to be agreed upon, and the net amount received from such sales shall be equally divided between the syndicate and the company, the amounts to be paid to each the month following the sale thereof. That the Continental Specialty Company shall continue the manufacture of its products under its formula for the purpose of supplying the same to the American Druggists' Syndicate as and when required at twenty (20c) cents per pound net in bulk, payable the 5th of the month following the purchase.

"The American Druggists' Syndicate agrees: To carry a stock of the prepared products as manufactured by the Continental Specialty Company at its various distributing depots, and also as far as possible with the druggists connected with its syndicate. That it will use due diligence in pushing the sale of the said products to the trade generally by advertising, soliciting, and by their travelers and otherwise. That the prices which have been in vogue by the company to the wholesale trade for those products will not be reduced unless by mutual consent in writing. That the net amount paid by the syndicate to the company each month for the ointment furnished in bulk at twenty (20c) cents per pound (less fifteen [15%] per cent. to cover the expense and cost of manufacturing) shall be applied as a credit towards the payment of the fifty thousand ($50,000.00) dollars to be paid to the company, provided the same is paid within five years from this date. That upon the syndicate completing its payment of fifty thousand ($50,000.00) dollars to the company as above it shall at once obtain the trade-mark, formula for preparing the products, and the sole right to use the company's name.

"If at the expiration of two years from this date the syndicate should desire to discontinue this sales agreement, it can exercise that right by giving the company thirty days' previous written notice, and thereupon returning to the company or paying for any unsold products that they or their depots may then have on hand that were furnished by the company free of cost, and all

money that may have been credited the syndicate from the proceeds from material furnished in bulk, which would have been a credit had the syndicate exercised the right of purchase, shall be held by the company as compensating damages.

"If at the expiration of two years from April 1, 1913, the syndicate should desire to continue the agreement with the company, the syndicate agrees in that event to purchase from the company for the remaining three years Continental Ointment in amounts of not less than five thousand ($5,000.00) dollars annually, the amounts to be paid for the month following the purchase, and the amount so received by the company, less fifteen per cent. to cover expense and cost of manufacturing, shall be credited to the syndicate on account of the fifty thousand ($50,000.00) dollars purchase price as agreed, and to be paid within five years from April 1, 1913.

"Awaiting your confirmation of the above, and directions for shipping the stock and material we have on hand, we beg to officially confirm the above agreement.

"Yours very truly,              Continental Specialty Company,
                                "Clarence Cottman, President.
"F. A. Savage, Treasurer."

To this the defendant answered by a letter of which the only material portion is as follows: "We have received your consolidated letter covering our proposal, and there is but one objection that we have to make to it, and that is the paragraph which stipulates that we shall buy at least $5,000 worth a year after the second year. We are willing, however, to waive even this, provided it is distinctly and positively understood with your people that we are not sanguine of making a success of the sale of the ointment." To which the plaintiff replied on April 14th, so far as is material, as follows: "We are prepared to withdraw the stipulation put forward, that you are to buy at least $5,000 worth per annum after the second year, leaving the amount that you are to purchase entirely with you to decide. We might suggest, however, that should, after two years, the sales prove such as we mutually hope and expect, you will then commence the payment to us of a substantial amount each year on account of the purchase price. We are perfectly willing to leave to your good judgment the amount you are to pay us annually on account of the $50,000.00 to be paid us within five years from April 1, 1913."

The defendant made some unsuccessful efforts, whose good faith the plaintiff challenges, to sell the ointment during the two succeeding years, and on April 1, 1913, wrote the plaintiff a letter notifying them that they desired to discontinue the sales agreement. This letter presumptively reached the plaintiff on April 2, 1915, and is the breach laid in the complaint. The court held that the notice of April 1st was not in season, as under the contract it should have been given thirty days before the expiration of two years, which would be on or before March 2, 1915. The defendant on this appeal contends that there was no absolute contract to purchase the formula for $50,000, but only an option; and, second, that within the terms of the contract a notice given at the expiration of the two years would be sufficient.

Tomlinson, Coxe & Tomlinson, of New York City (John C. Tomlinson, of New York City, of counsel), for plaintiff in error.

Miller & Auchincloss, of New York City (Albert C. Ritchie and Stuart S. Janney, both of Baltimore, Md., of counsel), for defendant in error.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). The letter of April 1, 1913, was written in response to the suggestion of the defendant in its letter of March 4th that the plain-

tiff might treat its own letter of February, 28th as the contract be-tween the parties, or that it might prepare a contract embodying those provisions and send it for signature. The plaintiff adopted the second alternative, and the letter of April 1st begins with the statement that it is submitting "a condensed agreement." We therefore incline to hold that the parties intended the letter of April 1st to take up all the prior negotiations and to be the basis of their mutual rights. This is the position of the plaintiff itself, and since in our judgment the result is no different, whether or not we consider the earlier correspondence, we shall assume that the letter of April 1, 1913, was intended to be the final embodiment of the negotiations, without making any decision upon that question.

We cannot find in that letter any express undertaking to purchase the formula, and the first question resolves itself, therefore, into whether, from reading the document as a whole, it becomes apparent that the defendants agreed to purchase the formula if they did not repudiate the contract within two years, or whether the purpose was to give the defendant an option at any time within five years for that purchase at the price of $50,000. The contract starts with provisions for the sale of the stock of products which either party has on hand anywhere. These the defendant agrees to sell at regular trade prices to be agreed on, the amounts to be divided equally between the two parties. So far the contract cannot be held to be material to this controversy. For the future, the plaintiff was to continue to manufacture its product and supply it to the defendant at 20 cents a pound, which the defendant should pay on the 5th of the month following the purchase. The defendant agreed to carry a stock of these products at its various depots and elsewhere, and to use due diligence in pushing their sale at prices which had theretofore been made current by the plaintiff itself. These are the only express obligations which the defendant assumed in the contract. The rest is to be drawn from inference. Continuing, the contract then provided that the amount paid by the defendant each month, less 15 per cent. for manufacture, should be applied as a credit "towards the payment of the $50,000 to be paid to the company"—i. e., the plaintiff—"provided the same is paid within five years from this date," and that the defendant upon completing its payments should obtain the trade-mark, the formula, and right to use the plaintiff's name.

Here the engagements of the parties cease, for the remaining two paragraphs, about which much of the controversy has turned, relate only to provisions for its continuance or termination. Now it seems to us that the contract up to this point did no more than, in case the defendant chose, while the contract endured, to purchase the formula, to give it the privilege of crediting upon the purchase price 17 cents a pound for all the ointment which it had theretofore purchased, but that it did not commit the defendant to a purchase without an acceptance of the option. Indeed, we think that there can be no reasonable argument to the contrary, unless the remaining paragraphs are considered. Therefore the question turns upon the effect of the two subsequent paragraphs, which, though intended to fix the duration

of the "sales agreement," must necessarily be read with the contract as a whole, and are proper to throw light upon the intent of the earlier stipulations.

The first paragraph provides that the defendant may terminate at the end of two years by giving thirty days' previous written notice, that thereupon it shall return to the plaintiff all goods on hand or pay for them, and that all money which would have been credited to the defendant, "had it exercised the right of purchase," shall be held by the plaintiff. Every one likewise concedes that this paragraph contemplates that within the first two years the defendant shall not be bound to declare upon its option; but the plaintiff insists that the contract meant to limit the option to a period of two years, and that, if the defendant did not disavow the contract within two years, it necessarily agreed to take it up. It relies particularly for that construction upon the phrase, "had the syndicate exercised the right to purchase." There is force in this contention. The language seems to imply that all conditions upon the right of purchase would be terminated at the end of two years.

When we come, however, to the last paragraph, a different intent is manifested. Now it is quite true that this paragraph was declined by the defendant in its letter of April 10th, and its refusal was confirmed by the plaintiff's letter of April 14th, so that as a stipulation between the parties it does not exist. Still we may consider it in deciding what the meaning of the prior terms actually was, and from that consideration it seems to us clear that the option continued till the end of the contract. The proposed stipulation bound the defendant to buy at least $5,000 of ointment annually for the remaining three years at the old terms, with the same privilege of crediting all but the cost of it upon the purchase price. Now, if the defendant's continuance of the sales agreement effected an election to buy under the option, such a stipulation would have been wholly irrelevant to the consequent relations of the parties. By hypothesis the plaintiff was to get no profit from the sales, and could have had no motive of its own to continue the business. All it could be concerned with thereafter would be the terms of payment, and the stipulation was not intended merely to fix those terms: First, because it covered only a small part of the price at most; second, because the provision for credit upon the purchase price would be quite out of place; and, third, because it is too clearly an agreement to purchase goods in the future. If, on the other hand, the option still remained open, the purpose and the form of the stipulation both are apparent, and fit with the arrangement as a whole, because the plaintiff would become assured at the least of a substantial sale of its ointment at the profit originally contemplated and the agreement would continue.

The only possible explanation consistent with the plaintiff's position is that the paragraph was inserted to insure the defendant during the last three years of an adequate supply of the ointment; but this is impossible, because it contains a promise of the defendant, and the obligation to purchase a minimum is inconsistent with a bare intention to guarantee the obligor a supply of the goods. The mean-

ing of the agreement as originally proposed by the plaintiff does not, therefore, seem to us to admit of much doubt; but it must be conceded that, after the defendant had rejected the minimum purchases during the last three years, there was not much purpose in the division of the period into two parts. Moreover, it is true that the defendant in two years would have had an adequate opportunity to learn what the commercial future of the ointment would be, and ought to have been in a position to decide upon the option. Yet since the plaintiff drafted an original contract such as to show that the defendant was to retain its option for the whole period, we should be slow to impute to the defendant's rejection of the only rigid obligation which it contained a purpose to substitute a much more onerous undertaking, not proposed in the original form submitted by the opposite party. While that rejection did, it is true, somewhat mutilate the scheme as originally proposed, we will not say that the resulting obligations were more favorable to the plaintiff than those it first put forward; such an interpretation would too obviously violate what both sides had in mind.

In the face of such structural difficulties we should not be disposed to lay stress upon much stronger language than is to be found in the words "to be paid," which occur several times in the agreement, or upon the imperfect subjunctive already noticed in the first of the two paragraphs. Were we, however, to go over the language of the two paragraphs with verbal nicety, our conclusion would be here and there confirmed. For example, in the first paragraph occur the words, "discontinue this sales agreement"; in the second, "continue the agreement." Such language, unless controlled by its context, normally refers to the sales agreement earlier provided before, which only bound the defendant to "use due diligence in pushing the sale of the ointment." It seems to us pretty clear, therefore, that the original purpose of the plaintiff was to give the defendant two years generally "to push the sales," and at the end of three years to require it to buy at least $5,000 a year of the ointment. These things the defendant must do absolutely and at its own risk. If it chose at any time within five years to purchase the formula, it might do so by exercising its option, and in that case an account should be struck between the parties, in which the defendant should be allowed 17 cents for each pound that it has purchased theretofore. When the defendant refused the second paragraph, the contract remained for the rest of the term, what it had been before, an obligation to "use due diligence in pushing the sale," and the defendant, having never exercised its option, was under no obligation to pay the purchase price. At best we should feel that any other interpretation was too doubtful to survive the usual canon contra proferentem.

It is quite true that in the letter of April 14th the plaintiff used language indicating that it supposed the defendant would be under an absolute obligation before five years had expired; but this was only in the form of a suggestion to the defendant, and the last of those paragraphs from that letter quoted in the statement of fact puts the matter again in question. In any event, the defendant never made

answer to that letter, and no expressions in it can be taken as part of the contract between the parties, except in so far as it accepted the limitation imposed by the defendant in its letter of April 10th. It follows, therefore, that the defendant is not shown to have been under any absolute obligation to purchase the formula, and any consideration of the point upon which the case turned below becomes unnecessary. Upon that question we are not ourselves wholly in agreement. It may be that the plaintiff is right in maintaining that the notice of discontinuance must be served within 30 days before April 1, 1913, and that the defendant was guilty of a breach of the contract; but that breach was at most limited to a failure to push the sales with due diligence, which, as we view it, was the only obligation under which the defendant at any time came, unless it chose to accept the formula. No damages for such a breach were proven, and indeed none were asked upon the trial. If any such point is to be taken, the matter will have to be raised upon a new trial.

The judgment must be reversed, and a new trial ordered.